IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.  No. 8-CR-1980

SARAH S. OCHOA,

    Defendant.

### MEMORANDUM ORDER AND OPINION DENYING DEFENDANT'S MOTION TO DISMISS THE HOBBS ACT CHARGE AS UNCONSTITUTIONAL

THIS MATTER comes before the Court on Defendant Sarah Ochoa's Motion to Dismiss the Hobbs Act Charge as Unconstitutional (Doc. 88).[1]  A grand jury charged Ochoa with violating the Hobbs Act, 18 U.S.C. § 1951, and the Federal Kidnapping Act, 18 U.S.C. § 1201(a)(1), after she allegedly kidnapped a Santa Fe realtor and forced the realtor to withdraw and hand over the entire balance of her account at the Los Alamos National Bank.  In this Motion, Defendant argues that the Hobbs Act is unconstitutional as applied to the facts of this case because interstate commerce was not "cognizably affected" by the Defendant's actions.  Because the Defendant's actions affected interstate commerce to a sufficient degree, the Hobbs Act is constitutional as applied to the facts of this case and the Court DENIES Defendant's Motion.

---

[1] This motion pertains only to the Hobbs Act charge against Defendant.  The Court previously denied Defendant's Motion to Dismiss the Federal Kidnapping Act charge (Doc. 113).

## BACKGROUND[2]

On November 29, 2007, Defendant Ochoa contacted Marilyn Foss, an employee of Sotheby International Realty in Santa Fe, New Mexico and requested to view several properties in Santa Fe on December 3rd. Ochoa identified herself as a wealthy Lebanese woman named "Nata Ramien." She said that she and her husband "Hasheim" wanted to buy a house for their daughter who had just graduated from Yale Medical School and was moving to Santa Fe for her residency. At 11:00 a.m. on December 3rd, Ochoa met Foss in front of the Santa Fe library as planned. After visiting a property in Tesuque, the two traveled to a property at 38 Calle San Martin in Santa Fe.

While Foss was showing Ochoa the basement of the property, she saw Ochoa pull what looked like a black semi-automatic handgun out of her purse. Fearing for her safety, Foss attacked Ochoa, but Ochoa prevailed after a brief struggle. Ochoa allegedly sat on Foss's chest, put the gun to Foss's head and in her mouth, and threatened to kill Foss. Ochoa also demanded $500,000 and threatened to strap a bomb to Foss. When Foss protested that she did not have that much money, Ochoa expressed skepticism, noting that Foss had "been in the business a long time" and claiming that her husband, Hasheim, had chosen Foss for that reason. Ochoa then demanded that Foss drive her to the Los Alamos National Bank in Santa Fe where Foss maintained an account and ordered Foss to withdraw the entire balance of her account—half in $20 denominations and half in $100 denominations. The two entered the bank together and Ochoa waited in the lobby while Foss went to the teller window. As instructed, Foss withdrew the balance of her account—about $8,000. While the teller was conducting the transaction, Foss

---

[2] The Court sets out the facts as alleged by the Government.

attempted to alert the teller to the robbery by writing "bomb" and "help" on the teller's desk protector, but the teller did not see Foss's message. As the teller was counting out the bills, Ochoa approached the window and told the teller that he did not have to count the money. The teller placed the money in a bag and handed it to Foss who handed it immediately to Ochoa.

After Ochoa fled from the bank, Foss reported the incident to Bank officials. Worried about a potential bomb threat, the Bank closed its doors for two hours while local and federal authorities searched the area. The Vice President of the Los Alamos National Bank estimated that, in the two hours the Bank was closed, it lost out on multiple transactions including: foreign currency transactions, transactions to issue traveler's checks, transactions to issue money orders (the average money order was $1,579 each), transactions to issue cashier's checks (the average cashier's check was $10,344 each), domestic wires (the average wire amount was $63,188 each), international wires and international drafts. Furthermore, the Los Alamos National Bank chose to assume the $8,000 loss from Foss' account.

## DISCUSSION

A grand jury returned an indictment charging Ochoa with violation of the Hobbs Act, 18 U.S.C. §1951. The Hobbs Act prohibits interference with commerce by threats or violence. Specifically, the Act states:

> Whoever *in any way or degree* obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery . . . or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

(Emphasis added.) The amended indictment lists both Foss and the Los Alamos National Bank as victims of Ochoa's crime. Ochoa filed this Motion to Dismiss the Hobbs Act Charge as

Unconstitutional, alleging that interstate commerce was not "cognizably affected" by the robbery and, therefore, the charge should be dismissed.

**I.     *De Minimis* Effects Test**

The Hobbs Act broadly prohibits robberies that affect commerce "in any way or degree." The Tenth Circuit has interpreted this language to mean that the government need only show a *de minimis* effect on commerce. *United States v. Zeigler*, 19 F.3d 486, 489 (10th Cir. 1994); *United States v. Bolton*, 68 F.3d 396, 399 (10th Cir. 1995). Very little is needed to show a *de minimis* effect on interstate commerce; in fact, the Tenth Circuit has sustained convictions under the Hobbs Act in cases presenting only *potential* effects on interstate commerce. *Zeigler*, 19 F.3d at 490. Furthermore, the government need not prove that the offender actually intended to affect interstate commerce. Rather, the government need only show that the defendant "deliberately performed an act, the ordinary and natural consequences of which would be to obstruct, delay or affect interstate commerce." *Id.* at 491 n.3 (quoting jury instructions issued in district court). *See also United States v. Wang*, 222 F.3d 234, 238 (6th Cir. 2000) (stating that robbery of individual need only have had a realistic probability of affecting interstate commerce); *United States v. Harrington*, 108 F.3d 1460, 1469 (D.C. Cir. 1997) (quoting jury instructions which state that the government need only show that offender committed an act which have the natural consequences of obstructing, delaying or affecting commerce); *United States v. Quigley*, 53 F.3d 909, 910 (8th Cir. 1995) (stating that realistic probability of affecting commerce may be sufficient under the Hobbs Act).

When the victim of the robbery is a business, the *de minimis* standard is met by a showing that the assets of a business engaged in interstate commerce were depleted during the robbery. *Zeigler*, 19 F.3d at 489. Under this so-called "depletion-of-assets" theory, "commerce

is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted . . . , thereby curtailing the victim's potential as a purchaser of such goods." *Id.* at 490.  For example, in *United States v. Nguyen*, the Tenth Circuit held that the *de minimis* standard was met when the defendant robbed a local restaurant which sometimes purchased food products from out-of-state companies.  155 F.3d 1219, 1224 (10th Cir. 1998).  In addition, the Court noted that the restaurant closed for 22 days following the robbery, which further diminished its ability to purchase out-of-state goods.  *Id.*

## II.     Business v. Individual

When determining whether a crime had a *de minimis* effect on interstate commerce under the Hobbs Act, most courts distinguish between crimes directed toward businesses and crimes directed toward individuals.  The "overwhelming majority of cases" brought under the Hobbs Act involve robberies of businesses.  *United States v. Quigley*, 53 F.3d 909, 910 (8th Cir. 1995).  While the robbery of a business often affects interstate commerce under the depletion-of-assets theory, the robbery of a single individual is less likely to affect interstate commerce.  *See id.*  In *United States v. Collins*, the Fifth Circuit held that criminal acts directed toward individuals only violate the Hobbs Act if "(1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce;  (2) if the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce; or (3) if the number of individuals victimized or the sum at stake is so large that there will be some 'cumulative effect on interstate commerce.'"  40 F.3d 95, 100 (5th Cir. 1995).  Several other circuits have adopted the Fifth Circuit's so-called *Collins* test.  *See, e.g.*, *Quigley*, 53 F.3d at 910.

Building on the first and second prongs of the *Collins* test, some courts have held that the

5

robbery of an individual violates the Hobbs Act if the defendant targets the individual *because of* his connection to a business.  For example, the Sixth Circuit has held that a robbery of an individual may violate the Hobbs Act if the government can show a substantial connection between the individual victim and a business engaged in interstate commerce.  *United States v. Wang*, 222 F.3d 234, 239-40 (6th Cir. 2000) (noting that the connection must be substantial rather than merely fortuitous or speculative).  It suggested that "the Government might make such a showing by demonstrating that the defendant knew of or was motivated by the individual victim's connection to interstate commerce." *Id.* at 240.  The Second Circuit also adopted this approach and upheld the conviction of a defendant who robbed a Manhattan doctor at his home.  *United States v. Silverio*, 335 F.3d 183 (2d Cir. 2003).  In that case, the defendant chose to rob this doctor because the doctor had a celebrity clientele and the defendant believed the doctor kept hundreds of thousands of dollars of his business proceeds in his home.  The Second Circuit held that the *de minimis* connection with commerce was satisfied because "the robbery targeted the assets of [the doctor's] business rather than his personal property." *Id.* at 187.

      The Court has located three cases in which robbery convictions under the Hobbs Act have been vacated because of an insufficient nexus with interstate commerce.  In *Collins*, the defendant entered a man's home and robbed him at gunpoint of cash, jewelry, clothes and the man's cell phone and Mercedes-Benz.  40 F.3d at 97.  The government argued that interstate commerce was affected because the man was an employee of a national computer company and the theft of his personally owned car and cell phone prevented him from attending a business meeting or making business calls.  *Id.* at 99.  The Fifth Circuit rejected this argument, holding that the robbery "caused only a speculative *indirect* effect on a business engaged in interstate commerce." *Id.* at 101.  A year later, in *United States v. Quigley*, the Eighth Circuit affirmed the

acquittal of two defendants who robbed a pair of Native Americans who were on their way to purchase beer from a nearby store. 53 F.3d 909 (8th Cir. 1995). The Court rejected the government's argument that the robbery prevented the two victims from purchasing their beer, thus affecting interstate commerce. The Court noted that the defendants "did not rob the liquor store, but instead robbed individuals who patronized the store," *id.* at 910, and concluded that the robbery had no "realistic potential effect" on interstate commerce. *Id.* at 911. Finally, in *United States v. Wang*, the defendant robbed a woman in her home of $4,200, of which $1,200 belonged to the restaurant that she co-owned with her husband. 222 F.3d 234 (6th Cir. 2000). The Sixth Circuit reversed the defendant's conviction under the Hobbs Act, holding that "[t]he Government made no showing of a substantial connection between the robbery and the restaurant's business." *Id.* at 240. It noted, however, that such a connection could be established through evidence that the defendant "knew of or was motivated by" the individual victim's connection to a business engaged in interstate commerce. *Id.*

### III.   Application

The Tenth Circuit has not had occasion to develop the distinction between robberies of a business and robberies of an individual, although it has recognized that "the depletion of an individual employee's assets by robbery or extortion usually does not meet the jurisdictional requirement." *United States v. Vigil*, 523 F.3d 1258, 1266 (10th Cir. 2008). Here, Ochoa is charged with robbing an individual, not a business. Ochoa allegedly forced Foss to withdraw the balance of her account—money that belonged solely to Foss, not to the bank. *See United States v. Burton*, 425 F.3d 1008, 1010 (5th Cir. 2005) (holding that defendant who forced victim to withdraw money from her account using her ATM card stole only the victim's funds, not any funds belonging to the bank). Because Ochoa robbed an individual and not a business, this

Court must determine when the robbery of an individual sufficiently affects interstate commerce so as to permit federal jurisdiction under the Hobbs Act.

The Court begins by noting that, while the Tenth Circuit's cases upholding the *de minimis* standard all happen to involve businesses as victims, the Tenth Circuit has not limited the *de minimis* standard to such cases. The Court holds, therefore, that the *de minimis* standard applies in all Hobbs Act cases—even those cases where the victim is an individual. The Court further reaffirms that the government need not prove that the offender *intended* to obstruct or affect commerce. Rather, the government need only show that the defendant "deliberately performed an act, the ordinary and natural consequences of which would be to obstruct, delay or affect interstate commerce." *Zeigler*, 19 F.3d at 491 n.3 (quoting jury instructions issued in district court). In this case, the government has alleged facts showing at least a *de minimis* effect on interstate commerce.

First, the Court notes that Ochoa's actions had an actual and substantial effect on interstate commerce. Not only did the Los Alamos National Bank assume the $8,000 loss and reimburse Foss's account for that amount, but the Bank closed its doors to customers for two hours following the robbery. The Vice President of the Los Alamos National Bank opined that the Bank lost out on "numerous business, commercial and individual transactions" although it was impossible to calculate precisely how much business the Bank lost. In an effort to quantify the amount of business lost, the Vice President listed the number and type of average daily transactions. For example, the Bank conducts approximately 14 transactions to issue cashier's checks each day. The average cashier's check is worth $10,344.00. Similarly, the Bank conducts five domestic wires each day; the average domestic wire amount is $63,188.00. If the Bank lost even one of these transactions because of its two-hour closure, that loss would have a

substantial effect on interstate commerce. Furthermore, the Vice President stated that two of the Bank's tenants—Sun Mountain Capital and Title Guaranty & Insurance Company—had to evacuate and close for business. This is not a case in which the effect on commerce was merely speculative. By her actions, Ochoa "plainly and negatively affected the operations of a business." *Vigil*, 523 F.3d at 1266.

Second, the closure of the Bank was the direct consequence of Ochoa's actions.[3] The two-hour closure was the ordinary and natural consequence of the Defendant threatening Foss with a bomb and subsequently forcing Foss to enter the Bank. When Foss reported the robbery and bomb threat to Bank officials, the Bank became understandably concerned that a bomb remained hidden in the Bank. Due to the serious threat, the Bank was forced to close its doors until local and federal bomb squads had conducted a thorough sweep of the premises. It is true that Ochoa did not direct the bomb threat at the Bank—rather she directed the threat at Foss while the two were in the Santa Fe residence. However, it was entirely foreseeable that the Bank would have to evacuate and close its doors once Foss reported the bomb threat. After all, it was Ochoa's decision to issue the bomb threat and subsequently force Foss to enter the Bank. The Bank closure was the ordinary and natural consequence of Ochoa's actions in threatening Foss with a bomb and then forcing Foss to enter the Bank to withdraw her money.

---

[3] The Government also argues that the Bank's assumption of the $8,000 loss in Foss's account was the ordinary and natural consequence of Defendant's actions. This argument would be persuasive if the Government had put forward evidence showing that the Bank had a policy of assuming the loss and reimbursing their customer's account in situations like this. The Government did not develop this argument, however, and the Defendant submitted a letter by the General Counsel of the Bank stating that the Bank "*chose* not to pass the loss on to our customer." (Emphasis added). This evidence suggests that the Bank made a one-time, ad hoc decision to reimburse Foss's account and that such reimbursement was not the ordinary consequence of Defendant's actions. Therefore, the Court has chosen not to rest its conclusion on the Bank's apparently discretionary decision to assume the $8,000 loss.

The Defendant argues that the Bank closure was not sufficiently tied to the robbery and that the two-hour closure was merely the result of the ensuing investigation rather than the result of the theft itself.  Defendant's reasoning is flawed.  The Defendant's crime did not begin when she entered the Bank with Foss; rather, the robbery began in the basement of the Santa Fe property when Defendant allegedly pulled a gun on Foss and demanded $500,000.  At that time, Defendant specifically threatened to strap a bomb to Foss.  The bomb threat was made during the course of the robbery and was an integral part of that robbery.  In fact, the bomb threat made such an impact on Foss that when she had a chance to pass a message to the bank teller she chose to write "bomb" on the teller's desk protector.  In the victim's mind, then, the possible presence of a bomb was arguably the most urgent threat during the course of the robbery.

While the Tenth Circuit has not yet adopted a test to determine when the robbery of an individual sufficiently affects interstate commerce under the Hobbs Act, the Tenth Circuit has articulated several basic principles that apply to all Hobbs Act cases.  First, the defendant's actions need only have a *de minimis* effect on interstate commerce.  Second, any effect on commerce must be the ordinary and natural consequence of defendant's actions.  Applying these basic principles, the Court concludes that Ochoa's actions had at least a de minimis effect on interstate commerce and that the effect was the ordinary and natural consequence of her actions.[4]

---

[4] Alternatively, the Government argues that Ochoa's actions met the jurisdictional requirement of the Hobbs Act because Ochoa deliberately targeted Foss because of Foss's employment with Sotheby International Realty and her career in selling high-end homes.  According to the Government, Ochoa chose to rob Foss because she believed Foss's job gave her access to hundreds of thousands of dollars.  In other words, the Government argues that this was really a robbery of a business, not an individual.  In *United States v. Silverio*, 335 F.3d 183 (2d Cir. 2003), the Second Circuit accepted a similar argument and upheld the Hobbs Act conviction of a defendant who robbed a famous Manhattan doctor in his home because he believed the doctor kept his business proceeds in his home.  Given the Court's holding above, the Court need not address the merits of this approach.

Furthermore, if the Tenth Circuit chooses to join its sister circuits in adopting the Fifth Circuit's *Collins* test, this Court finds that the facts here fall squarely under the second prong of *Collins* as "acts [that] cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce." *Collins*, 40 F.3d at 100.  Ochoa's choice to issue a bomb threat to Foss and then take Foss to the Los Alamos National Bank created the likelihood that the Bank would have to close, thereby losing money and affecting interstate commerce.

## CONCLUSION

For the reasons discussed above, this Court DENIES Defendant Sarah Ochoa's Motion to Dismiss the Hobbs Act Charge as Unconstitutional.

**SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE